Good morning, Your Honors. Assistant State's Attorney, Susanna Buccaro, on behalf of the people. You know the basic rule, 15 and 15. If we have a lot of questions, then we'll give you additional time. But additional time doesn't mean that you just go on and on and on. And with that, you may proceed. Yes, Your Honor. And I would just indicate to you, I'm really curious about how you're going to get over the cases of Holloway and Washington. For which issue? Washington. People v. Washington? Yeah. Okay. This is the jury instructions? Apprendi. Apprendi. Okay. Let's start wherever you'd like. Thank you, Justice. As I said, Emily Hartman for the Ashton-Daniel. Well, I'd like to focus on issues one and two, that the identification here was not reliable. But then I'll talk about the conflicting jury instructions and Apprendi. The identification here was made under suggestive circumstances and should not have been admitted. However, even if this Court finds that it was properly admitted, the reliability of the identification of Mr. Daniel was too low to sustain the State's burden of proof. In this case, Chaffee described the offender as somebody weighing 200 to 210 pounds, where Mr. Daniel weighs 156 pounds. But first of all, I looked at the photo. He's wearing a bulky sweatshirt. And at best, any time somebody gives an estimate of weight, that's what it is. It's an estimate of weight. That's number one. Number two, the weight that you're assuming was accurate was not the product of somebody getting on the scale. It was read off of a driver's license. Now, I'll wager that in this courtroom right now, if we had a scale and took everyone's driver's license, there may be some discrepancies there. I think I saw that in the movie Liar, Liar, in fact. Well, for your first point, Mr. Daniel's wearing a sweatshirt when he came in, in the transaction, and the robber was wearing a T-shirt. So the robber is, with the T-shirt, you can see that he's more muscular. The sweatshirt would only make Mr. Daniel look bigger than he was. So given that, if you take the sweatshirt into account, it's actually the smaller person, Mr. Daniel, that's wearing the sweatshirt. Regarding the weight, of course, there may be a discrepancy between the reported weight and actual weight, but if you do look at the photo, you can tell that the person in the sweatshirt, who we know as Mr. Daniel, is smaller than the T-shirted man who robbed the store. And he said he had seen him before as well, so he'd have at least a couple opportunities to figure out the weight, right? He said he, at the time of the crime, he said he thought he might have recognized him maybe as somebody from the store. He changed his story at trial after he had learned that Mr. Daniel was a customer, and confirmed, you know, oh, I know him as a customer. But at the time of the crime, it was more of a vague, I think I might recognize him. Why don't we talk about that for just a moment, if you could. Sure. Give us your argument on why the use of the earlier video with the link card contributed to the suggestiveness of the line-up. Of course. Of the identification. So what happened, the police called Mr. Daniel, and we know that they told him the link card that was left at your store on the robbery was used in a transaction in your store on May 12th. And they tasked him with getting the video and cutting out the part that showed that transaction about 15 minutes before and after, and sort of making a copy of only that part. So they ensured that he would have watched the video, and he did watch it. He watched the video with the suggestion in his mind that this card that was left in the robbery was used in a store, and so he watched it thinking, oh, that's the robber. Let me just say, first of all, I'm glad to see that you're not the person who wrote the opening brief. Because on page 15 of the opening brief, the following clause, I'll read the whole sentence. In this case, police encouraged Shafi to view a video of Daniel using his link card in the store weeks prior to the armed robbery, telling Shafi that this was the same person that robbed him. And I thought, oh, that's interesting, until I pulled the citation of parts of the record that you cited to, not you cited to, your office cited to, that didn't bear out in any way, shape, or form, that he was told that this was the same person that robbed him. Unless this office has taken a new definition of the word tell to include imply, that is a misrepresentation of the record. And I have always championed both the state's attorney's office and the state appellate defender's office for the veracity of their assertions of record in their briefs. I think it's, in general, exemplary. And that's why it was disappointing for me to see this put in the opening brief and not corrected elsewhere in subsequent briefs. But go on. I apologize for not correcting it and for my predecessor's, I'm sure, inadvertent misrepresentation of the facts. It is implied and it is an inference. But we know from the record that they told him that it was the link card was left and that card was used in the transaction. And as I said, we also know that they did task him with bringing them the part of the video. They said they wanted about roughly 15 minutes before or after. So this, he did watch it. And we know he watched it after this conversation with the police. So now we get to the issue of even if there is some suggestion and even if the suggestion is an improper suggestion, you have a circumstance. And it's repeated throughout the briefs about how somehow his link card being at the scene of the robbery is in no way damaging to the identification of the individual. So if I can parse out the way that argument appears to be, it's that he was in the store earlier. He had his link card in the store earlier. His link card was in the store on the day of the robbery and presented by the robber. And since this person was identified in a photo array and later in a lineup, it just so happened that the link card was stolen by somebody who more resembled him than any of the other people included either in the lineup or in the photo array. And we go on and we go on and we go on. So does this matter at all in the context of the facts of this case? Yes, Your Honor, it does matter. With regard to the fact that he was more similar to the offender than the four or five other people in the photo array and lineup, this is a cross-racial identification. There's no guarantee that picking a few people, we're going to have somebody who everybody looks exactly like the person. So, yeah, he somewhat resembles him. But the link card doesn't get passed. Without the identification, the link card doesn't prove that Mr. Daniel was the robber. It's ambiguous at best. The reason is that the link card, the robber presents it, and he doesn't, you know, try to use it or anything. He just kind of hands it to him and asks for the balance. How much is on this? The link card we know was issued on May 12th. It's reported stolen on June 10th, about a month later when the money was. And about two weeks after the robbery when realizing it, arguably realizing that it's gone and it was left in the store that he robbed if he was the person, and realizing that was a big mistake that would lead to identification, it was reported stolen. And there's nothing in the record that would suggest that a wallet was stolen, a burglary occurred, a robbery occurred, a driver's license was stolen. Just simply that one card was stolen, reported two weeks after the robbery. Well, if he had dropped it and left it in the store, that's how one card would be stolen. But the significance of the two weeks after the robbery, at this point the police aren't looking for Mr. Daniel. There's nobody inquiring around about him. He's not on notice that anybody has identified him or that he's a suspect in this crime. So it's not significant that he necessarily waited a week or two before reporting it. Maybe he didn't realize it was gone until then. And if you look at the dates, this is a month after it was issued. This is when the money comes back on. So it is also significant when the robber presents it, he wants to know how much is on it. The owner would know, would have a better idea of how much is on it, than somebody just like, hey, I found this link card, here, and then I'll leave it here, and then throw suspicion on somebody else. So the link card is ambiguous. There aren't reasonable interpretations on both sides of the coin. It was reported stolen. And it is not nearly enough without the identification to support a conviction for Mr. Daniel. Let me ask you one other question on the identification, because it seems like this is a building blocks argument from the initial brief, particularly that there were a number of things that were suggestive when this was first presented to the victim in an effort to identify who this was. And then it was compounded when you get into court and there's an in-court identification. And the inference seems to be from your brief, the initial brief that was filed here, that he was, the victim was unable to identify the defendant from the witness stand. Was there? He had trouble. Okay. He had. What was the trouble? Because it was hard for me to sort of figure out from reading the transcript. Yeah, he was unable to, he couldn't, you know, did you see anybody that you recognized, and he couldn't at first. And then the court asked him to walk around the courtroom and see, and then he identified the defendant after he took a, you know, he walked around and looked. The state had sort of led him and said there was a television blocking your view, you know, and he said yes. But there was no indication in the record that the television was a complete block or somehow was in between him and the witness stand, and that's why he had to get up in the first place. It's a little. That's the reason I brought it up, because if you just read the transcript, it seems pretty simple. The judge says step into the well of the courtroom. Yeah. Was there the possibility that his view was blocked of the defendant by an exhibit, a television, or something? It's possible. I think it's unlikely because you have to consider that the defendant needs to be able to see the television and see the witnesses, so an exhibit or a television wouldn't be placed directly between the defendant and the witness. But at the same time, you know, the fact remains he did have difficulty making an ID in court. And you have to consider that right after he watches this video, you know, seeing the person that used the link card thinking this is the robber, he immediately goes to the police station and views a photo array. In that photo array, Daniel was the only one wearing a white T-shirt, which is what the robber wore, and the only one with no facial hair, consistent with Shafi's description of the robber. He makes a tentative ID of Daniel at this time. And then two months later, as he views the lineup, again, Daniel is the only one wearing a white T-shirt, the only one in common between the photo array and the lineup. But, you see, the brief seems to argue both sides of the issue. You're saying that the repeated identification procedures build a momentum that's damaging and unfair to the defendant. Correct. Yet on page 20 of the opening brief, it says, the police did not conduct any other identification procedures after the suggestive lineup, which could have provided an independent source of identification, which appears to be urging yet another identification procedure at that point, which is completely contrary to the argument that you make elsewhere or your office makes elsewhere in its brief, which is confusing to me. I apologize for the confusion. The police didn't make an attempt to do anything to remove the taint of suggestiveness. There was no other identification that we can say, as far as the standard that there needs to be an independent basis for independent recollection. There is nothing else that provides that in the record. So I think the gist of that statement is the police are certainly not required to bring in everybody they use in a photo array to stand in a lineup subsequent to the photo array so that he's looking at the same six people, are they? No, but it's still suggestive. I mean, they're not required to do that, and obviously we don't have to. It would be almost impossible, sure. But it's suggestive nonetheless. And in a normal case, when that's the only thing that's suggestive, it's not a problem. But when you have that happen after something here where he's got his own surveillance video, he's sitting there watching a video of the person he thinks is the robber, then there's a photo array, and then that person appears in the lineup, that suggestiveness is compounded. So the question is whether the suggestiveness goes to a weight that should be argued by the attorneys as a reason to discredit the identification, or whether it rises to the level where the court has to step in and say, this was so suggestive as to be unfair and to taint the identification so irrevocably that we can't trust it. The video, the police action in getting Mr. Schaffee to watch that video by cutting out the part that they needed and telling him, you know, we want this video because the link card was used in your store, the one that was left at the robbery, that action caused Mr. Schaffee to replace whatever picture of the robber on his head with Daniel and to taint any further identification. The judge should have done, you know, should have suppressed the motion to suppress identification. But alternatively, you know, we have also argued that the in-court identifications, because of all of this, are also so unreliable that they shouldn't have been given weight and that he wasn't proven guilty beyond a reasonable doubt. So there, aren't we really invading the province of the trier of fact? Because they, assuming it was, if it gets past your first argument, it was admissible. The question then is, are we really usurping the role of the trier of fact by saying, this is so unreliable that you can't rely on it, but yet was admissible? Well, the first thing is, there's a reason, you know, when police engage in suggestive behavior, the judge does screen it. It's the jury's not best equipped to deal with police action as far as suggestiveness and a due process violation that occurs there. In addition, in this case, the jury- Am I in a position to be able to say, yeah, that makes sense if your argument carries validity, that to suggest that when somebody does a second identification that you have to question it. And that is something that jurors or judges can rely upon their own experience in life to decide whether that is a reason to discount the identification made in court. But this jury was irrational when it took, when it heard about Shafi's identifications, the fact that he watched a video right before he made his first identification of Daniel and didn't discredit that. This was an irrational decision by the jury. Even taking all reasonable inferences in the light most favorable to the state, there just wasn't enough here. The identifications were that bad. This isn't a very common thing that happens in cases, but in this case, there are just too many problems, and starting foremost with that video. But there's really no implication or express statement in your brief, nor anything evident in the record that would ascribe anything other than good faith on the behalf of the police under these circumstances. There's no suggestion that they tried to suggest to witnesses whom to identify. Actually, in Perry v. New Hampshire, the Supreme Court, for a due process violation, there doesn't have to be intentional. I understand that, but we would have sort of a different balance if there was an attempt to do that, wouldn't we? I think it's actually the level of suggestiveness that's paramount. Whether or not it's intentional, it's how suggestive the procedure was that resulted from police action. It's footnote one where Dickensburg says that it really doesn't matter. The mens rea of the police is not important. The evidence here shows that Chaffee never got a good look at the robber. He was processing the link card and looking down. He was suddenly surprised by a weapon and only ever able to make an identification because of police suggestion. Because of that, we ask that this court reverse his conviction outright or reverse the trial court's ruling on the motion to suppress and remand his case for a new trial. Regarding the conflicting jury instructions that we argue for a new trial and also the apprendee violation in this case, the state here doesn't dispute that the instructions were conflicting. The conflicting part of it. The issue is plain error, right? The issue is plain error, right. So it admitted an essential element of the offense. It added an element from a different offense. And we can't have confidence in the jury's verdict because of the conflict between these instructions. And the law in Illinois is actually clear that when a jury is given conflicting instructions, it can't be harmless error. How do you get around where and what? I'm sorry? Oh, where and what. First, in this case they are distinguishable because we are also arguing closely balanced first prong plain error. In this case you have, in those cases, that wasn't argued. We have an object used as a bludgeon, so it would have been a dangerous weapon whether or not it was a firearm or another heavy gun-like object. And the evidence here was closely balanced. In addition, those cases are both wrongly decided. They both ignore longstanding Illinois Supreme Court precedent that says that conflicting instructions, especially when it involves an element of the offense, can be second prong plain error. Where and what rely on NADER, which is a United States Supreme Court case, which says that this issue isn't federal structural error. But the fact that our Supreme Court has used the term structural error sometimes in lieu of second prong plain error doesn't mean that they meant to equate it with federal structural error. The Supreme Court would not have overturned multiple cases holding that these jury instructions can be second prong plain error without expressly saying so. And in addition, I know there are some citations in the reply brief detailing cases where they found second prong plain error in circumstances that are not equivalent to federal structural error since they've used that term. But, for example, I know in People v. Rice, for example, the Supreme Court found that physically coerced confessions are I have a common sense question. When you get the issue instruction that says dangerous weapon or with a firearm, don't you think, obviously, a juror would understand what that doesn't matter? I mean, how would you react to that? Well, knowing that there are. Not as a public defender, but how would you answer that as a normal citizen on the jury? I know that there are. I think it's common knowledge that there are a lot of gun-like objects out there, BB guns, things that look just like guns. There was a picture in a Seventh Circuit case recently. I would be aware of that. And I would have said it doesn't matter if it was a firearm or not. He got hit over the head. That's enough for a dangerous weapon. So I would have found him guilty. I'm sorry. I would have found him not guilty. It's hard to say guilty. But as a juror, if I had found him guilty, it would have been dangerous weapon because I would have said that's enough. Excuse me. Yeah, it's words I can't utter. But in that case, they didn't have to find firearms. They could have found a dangerous weapon. They didn't have to make that sort of advanced determination of whether that brief glimpse of what Chaffee called a gun was a dangerous weapon. Your other argument about the jury instruction. Right. They should have made the determination. I'm sorry. Whether the judge or a jury should have, or whether there should have been a hearing on the term. The, I don't. No, I'm saying your first argument goes to that. Okay. The first argument, and the first argument is that when a jury, you know, is giving instructions like they clearly were here, it's not harmless error. It's clearly plain error, especially in this case where we do have conflicting evidence about how the object was used and they didn't recover a gun. They don't have any more than a brief picture to show that it was a real firearm. So. You know, I think your colleagues from the State would suggest that the only evidence that was mentioned, I mean, the gun was mentioned something like 27 times. Even defense counsel in closing argument talked about a gun. I just don't know where you're going with that. It was really a nonissue to the lawyers who were trying the case on both sides. And you can imply because they knew it was one or the other. The implement that was used in the offense was either a real firearm or at least a dangerous weapon. And so the question then becomes is this really plain error under the circumstances? Well, definitely because dangerous weapon is a separate offense. He wasn't charged with it. And he was never charged with it. It's a different offense. It has a lower sentencing range. It's not. It's mutually exclusive. And in this case, even if the parties in the arguments aren't disputing whether, you know, they say gun or firearm, that doesn't change the State's burden to prove to the jury beyond a reasonable doubt. It doesn't change the burden to make sure the instructions are accurate and reflect the offense charged. And it doesn't make the jury – it doesn't mandate that the jury find that it was a firearm. And moreover, firearm is a term of art. Laymen may speak of a gun or a firearm. But the Illinois legislature has defined firearm as something that actually has to be – I mean, it excludes all other BB guns or things. You have to really be able to fire a bullet at a high speed in order to be a firearm. So just because the parties might have thrown it about an argument and strategically chose not to argue on that point doesn't necessarily mean that we can ignore the conflicting instructions. It doesn't give us confidence in the jury's verdict. The jury believed it could find him guilty of armed robbery with a dangerous weapon, which is a different offense. And we don't know that Daniel was found guilty of what he's actually being punished for with his 34-year sentence, which, as Your Honor noted, we have argued violates of Prendy. I'm waiting for you on that. Of Washington, an Illinois Supreme Court case, Washington, was based on the prior version of the statute where it only said dangerous weapon. And firearm and dangerous weapon were the same thing. I mean, a firearm could be a dangerous weapon in that case. So all of the law in Washington is based on prior law that is no longer applicable. Mr. Daniel was charged with the post-2000 version of the law. And he was charged with a firearm. When the legislature separated those two crimes and specifically made them mutually exclusive, they... Did they make them mutually exclusive? Yes. You say that, but in reality, one is contained within the other. Well, not in armed robbery. Armed robbery with a dangerous weapon actually expressly says dangerous weapon other than a firearm. So in that case, there was an intent to make them mutually exclusive. It's not a lesser-included offense. It's a completely separate offense. It has separate sentencing schemes. The argument that because it used to be a firearm that it somehow still survived is belied by the legislature's saying that armed robbery with a dangerous weapon does not include a firearm. But in the issue instructions, you have the word or, which means either or. Right. But he wasn't charged with both. So they could find him guilty of either or, but that's essentially finding him guilty of an offense he wasn't charged with. Had he been charged with both, the argument would be just to sentence him under the lower sentencing scheme when if the instructions hadn't distinguished. But he wasn't charged with both. He wasn't charged with a dangerous weapon. And so using dangerous weapon and telling the jury they could find him guilty of a lower offense that he wasn't charged with was error. The typical problem with apprendi cases in finding plain error is that often it's a situation where they find the gun or it's crystal clear the gun was fired or something where we know that the factor was harmless. It would have found a reasonable doubt. But in here, as I've argued before, the fact that it was used as a bludgeon and the fact that it wasn't found and there weren't much of a picture of it means we can't tell for sure that the jury would have found that fact. And he did get a sentence beyond 30 years, a very high sentence, which we've also argued is excessive in this case. So if this court doesn't agree that a new trial is warranted because the instructions are conflicting, this court should remand for resentencing. Are there any other questions? No, thank you. I'll reserve the rest of my time for rebuttal. Thank you. May it please the court. Assistant State's Attorney Susanna Buccaro on behalf of the people. Your Honors, the victim in this case recognized the defendant from the moment he walked into his store on the day of the armed robbery. Two eyewitnesses presented uncontroverted testimony that they had a clear and unobstructed view, not only of the defendant's face, but of the firearm that he was carrying. Did he testify to the victim that when he walked in the store that day to rob me, I knew who he was? Is that what he testified to? Your Honor, the record indicates that when officers responded to the scene, Officer Minag was the first officer to talk to Ayub Shafi following the armed robbery. And Ayub Shafi told him, I've seen him before. He did not know his name, but he recognized him as a prior customer who had been in the store on multiple occasions. And he told the officer that. He said he's been here before and one time he left in a taxi cab. Yes, he did not know who he was. But that identification that he made, that tentative, I know him, is a factor which this court considers in determining whether the identification was inherently reliable. If that were the case, why would they need to have him look at this earlier video? Your Honor, the police did not have him look at this earlier video. There's no evidence in the record whatsoever that the police did anything to encourage the victim to watch this video. And furthermore. Other than asking them to get it. Yes, Your Honor. Detective Pichelli. Get it. Look at it. Close your eyes. Edit it. No, Your Honor. The record is silent as to anything the police ever did to suggest that he should watch it. They merely asked for it in the course of their investigation. But more importantly, this issue was waived before this court. This issue was not preserved for appeal and therefore this court need not even consider it. The defendant has a responsibility on a motion to suppress. It has the burden to prove that an identification should be suppressed. And that burden includes the moment this evidence was presented to the trial court, it was the defendant's responsibility to alert the trial court to that evidence and renew the motion to suppress. Defendant did not do that. And thus this court need not even consider the merits of defendant's contention on appeal. This is exactly what the Illinois Supreme Court held in People v. Brooks. And in that case, Brooks held that where a defendant challenges a motion to suppress and the trial court denies it, a reviewing court may affirm a trial court's finding on a motion to suppress based on the evidence adduced at trial. A reviewing court may not, however, reverse a trial court's finding on a motion to suppress based on that same evidence. And that's exactly what the defendant is asking that this court do. Defendant is asking this court to litigate a pretrial motion for the first time on appeal. And that's entirely improper. People ask that this court not consider the identification, the victim's act of watching the surveillance video prior to the identification on the merits. Rather, we ask that this court find that that claim is waived. Furthermore, even if this court were to consider that. It is forfeited. Yes, Your Honor. It is forfeited, or at least. Furthermore, even if this court were to consider it, the record indicates that the victim's identification in this case was inherently reliable. And the United States Supreme Court held in Manson v. Braithwaite that where a defendant challenges an identification as impermissibly suggestive, a court should look at the totality of the circumstances. And the linchpin of that evaluation is the victim, the reliability of the victim's identification. And here there are a number of factors which indicate that this victim's identification was inherently reliable. When the defendant came into the store on the day of the armed robbery, there was nothing covering his face. The victim and the defendant were standing merely feet away from each other. Furthermore, the victim had a reason to have a heightened sense of awareness. As the defendant was rifling through the cash register, the victim had every incentive to be looking at this individual and committing his features to memory. In addition, the victim gave an accurate prior description of the defendant. The victim told the police this was a male black between 20 and 25 years old. At the time of the crime, the defendant was in fact 24 years old. In addition, the victim said he was between 5'7 and 5'10. The defendant was in fact 5'8. Therefore, he gave an accurate prior description. In addition, Illinois courts looked to whether the victim and the defendant had any prior acquaintance. Here the record's clear. The victim consistently told the police and told this jury that he had seen this defendant on multiple prior occasions. Illinois courts also looked to whether there was any police misconduct. And here there was none. The record indicates Detective Pacelli, in the course of his investigation, discovered that the link card had been previously used in the victim's store. He ran a background and got the date on which it was used. Then he called the victim and asked for surveillance video from that date. There's nothing to suggest that there was anything suggestive on behalf of law enforcement in this case. And furthermore, the record expressly rebuts that the act of watching the video surveillance had any effect whatsoever on the victim's identification. The victim was specifically asked on pages R81 and 82 of the record, Did you identify this defendant because you saw him in the video or because he was the person that robbed you? And the victim said, I know. I knew him. I knew when I saw him. And thus, clearly, the record rebuts the contention that defense counsel now raise that this was an impermissibly suggestive identification procedure. Furthermore, with regard to the jury instructions, this is an issue of plain error. And the error in the jury instructions does not amount to plain error in this case. The evidence here was not closely balanced. It was not closely balanced with regard to who was the perpetrator in this crime. And it was also not closely balanced as to whether the defendant in this case was armed with a firearm. When the jury saw these instructions and they saw the word dangerous weapon in the instruction, there is nothing that the jury could have reasonably concluded that that term meant other than a firearm. And that's because the evidence presented to them at trial only supported that this weapon was a firearm. There were two eyewitnesses, Shafi and Khan, both of whom testified that the weapon used in this case was a firearm. And as Justice Smith noted in People v. Washington, that's all that's required. The testimony of two witnesses who affirmatively state that they were robbed with a firearm is sufficient to find that the weapon was, in fact, a firearm. In addition, even though the weapon was not recovered, they saw it. They saw the weapon on the surveillance video. The jury saw the weapon for themselves, and they saw a defendant coming into the store, approaching the cash register, and pulling out that gun. Thus, the jury was able to make a determination visually upon the evidence that they saw what that weapon was. And there was no reason to believe that it was anything other than a firearm. As Your Honors noted, defense counsel here never challenged it as a gun. The theory at trial was that this was the wrong person. But there was never any dispute about the weapon that was used. Both parties mentioned in opening statement that there was a gun. The jury knew. The trial court told them the defendant was charged with armed robbery with a firearm. And then as Justin Lavin noted, they heard live testimony over 39 times. They heard either the word firearm, pistol whip, or gun. And thus, when they received those instructions, the only conclusion that the jury could have reached was that this weapon was, in fact, a firearm. Furthermore, this court, as recently as March 14, 2014, held in People v. Ware, as Your Honor noted, that any error in an instruction which omits or misdescribes an element is not a structural error. Thus, the fact that the instruction said dangerous weapon instead of firearm, as alleged in the indictment, did not lead to an unjust conviction in this case. Because the evidence was so strong that this was, in fact, a firearm, there's only one conclusion that the jury could have reached based on that evidence, and that's that this defendant was armed with a firearm. This argument similarly applies to defendant's allegations that the Apprendi violation results in reversible error. It does not. The Illinois Supreme Court held in People v. Crespo that where there is an Apprendi violation, which has been forfeited, which is exactly the situation in this case, this was not raised in the trial court, a forfeited Apprendi violation requires that the defendant show that the violation resulted in prejudice. There's no prejudice here. Had the jury received an instruction that the defendant was personally armed with a firearm, they would have said yes. Yes, he was. That's the only conclusion that the evidence supports. And in light of that, there's no relief that this court can afford defendant on appeal, not where the evidence clearly showed that defendant was armed with a firearm. Also, with regard to structural error, in the same year that Crespo was decided, the Illinois Supreme Court held in Thoreau that an Apprendi violation, which is forfeited, does not amount to structural error for the same reasons. Had the jury been properly instructed, they would have found that he was armed with a firearm, and thus it cannot be said that defendant's trial was unjust and fundamentally unfair when the result would have been exactly the same had they received the proper instruction. To address the one act, one crime argument, I see in your brief that you think that somehow these constitute separate acts. Yes, Your Honor. Yes, Your Honor. These do constitute separate acts. The indictment alleged that the defendant committed armed robbery with a dangerous weapon, two wits, a firearm, excuse me, not dangerous weapon, that he committed armed robbery by the use of force or by threatening the imminent use of force and that he carried honor about his person or was armed with a firearm. The indictment for aggravated unlawful restraints alleged that the defendant, knowingly and without legal authority, detained the victim while using a deadly weapon to wit a firearm. Continue on in that instruction. And in this case... Well, continue on in that charge. That's the extent of the language in that charge. But the aggravated unlawful restraint is premised on the fact that it was the way in which the armed robbery occurred. Yes, Your Honor. However, the evidence at trial supported that there were separate and distinct acts which the defendant committed to effectuate each offense. The evidence reveals that this defendant, when he came into the store, he approached the cash register and he pulled out a gun. And he demanded money. At that point, he committed each of the elements necessary to effectuate an armed robbery. But he didn't stop there. After he committed an armed robbery, he forced the victim onto the floor, pointed the gun at him, beat him with the gun, forced him to crawl into the back of the store, put a gun in his mouth, and threatened to shoot him. For what reason? He was still doing his armed robbery. He was seeking other proceeds from the armed robbery while he was doing that. Was he not? Yes. And wasn't that the charge? Yes, Your Honor. But at that point, all of the elements to effectuate armed robbery were complete. He had already gone through the cash register and taken the money. And he only further pushed off the... So your theory is that once he gets some proceeds, if he tries to get more proceeds, it's a different act? Well, no, Your Honor. My theory is based on this Court's holding in People v. Crespo, a 1983 case out of this district. And they cite Lee, right? Yes, Your Honor. But in Crespo, it's the exact same charges, but just similar facts. In that case, the defendant came into a tavern, and he had a firearm, and he ordered everyone on the ground. One woman refused to get on the ground, so he grabbed her by the hair, threw her on the ground, walked over to the cash register, and held a victim by knife point, took money from the cash register. The Court in Crespo reasoned that it was not necessary to throw the woman to the ground and hold the man at knife point in order to effectuate the robbery, that those were additional and distinct acts. And that's also true here. The trial court specifically reasoned during sentencing that the victim was beaten where the victim did not need to be beaten. So your theory is that when you're doing a robbery, you don't need to detain the victim. You can let the victim go. No, Your Honor. Well, isn't that the implication of your argument? No, Your Honor. That wouldn't be a very successful robbery, would it? Yes, Your Honor. The victim is detained by the... It's not a question of throwing him on the ground. He's not convicted of that. He's convicted of detaining him. Yes, Your Honor. But by throwing him on the ground and pointing the gun at him while he's on the ground, that's how he's unlawfully detaining him. And that was unnecessary to effectuate the robbery because he was already detained by nature of the firearm. So you're saying the method of detention separates it, not the act of detention. No, Your Honor. It's the act. Well, if it's the act of detention and you've conceded that you have to detain somebody in order to rob them... Yes, Your Honor. You do have to detain someone in order to rob them. And this Court has held in other situations where the two happen at the same time, it's a violation of one act, one crime. But that's not the case here. He threatened him by use of force. That's what initially detained him. And if that's all that happened, Your Honor, the people would concede that you're correct. There's a violation. But that's not all that happened. After detaining him by the threat of force, he then further unlawfully restrained him by forcing him in the back, putting the gun in his mouth, and threatening to shoot him. Those are separate, aggravating, and distinct facts. If he took him in the back as a further detention and didn't put the gun in his mouth and threatened to shoot him, would that be one act? No, Your Honor. It's once all the elements of the robbery are complete. I understand your argument. Furthermore, the people also argue that in this case, defendant was proven guilty beyond a reasonable doubt for the following three reasons. He was identified by two eyewitnesses who were unimpeached at trial. There was physical evidence literally linking him to the scene of the crime. And there was video surveillance. Linking? Excuse my pun, Your Honor. I accept all good puns. Thank you for complimenting that pun as good. Also, there was video surveillance which demonstrated that this individual was the person who committed this crime. And therefore, the people request that this court affirm the decision of the trial court and uphold defendant's convictions for armed robbery and aggravated unlawful restraint. Thank you. Briefly, Your Honors, with regard to forfeiture of the suppression issue, as counsel noted, this is a case where in a suppression issue, the court is expected to look at the totality of the circumstances. And unlike Brooks, in this case, counsel moved to reconsider the motion to suppress before final judgment. In Brooks, that didn't happen. So because after the evidence was presented, she had moved to the court to reconsider, this issue is not forfeited. In addition, Shafee's testimony at trial that he was not influenced by the video is just different. You know, he remembered him outside of the video. He was not so certain at the time of the crime. And we have never argued that Mr. Shafee knew that he was influenced by the video. You don't really need to address that argument. There's no implication that he was deliberately lying. People have ways. You know, we haven't argued it except in the briefs, but everyone understands the vagaries of eyewitness identification. And part of that, obviously, is that you can convince yourself that you're more positive after the fact than you actually were beforehand. There's all sorts of empirical data on that. So I don't think you need to address that. Human memory is valid. Well, lastly, with regard to plain error on the jury instruction issue, on page five of the supplemental reply, cited to three different cases where Illinois Supreme Court has held second-pronged plain error when there are conflicting or defects in jury instructions. It is absolutely something that can be second-pronged plain error, and in this case, first-pronged plain error as well. So the cases of Reddick, Jenkins, and Ogunsola all have reversed and ran it for a new trial, all in forfeited jury instruction conflicts, and all in second-pronged plain error. In this case, the closeness of the evidence and the extent to which these are two different crimes, one of which was uncharged, certainly meets that standard. We respectfully request that this Court reverse Mr. Daniels' conviction or alternatively remand his case for a new trial, alternatively remand for resentencing. Thank you. Thank you both. Thank you. You both argued very well. You withstood the pertinent questioning. Pertinent. Yeah, questioning by especially one justice who was out to. . . No, no, no. You did everything to say you probably shouldn't say, but that's usually what you do. But you did a good job pinch-hitting. It actually was fun to listen to both of you. Yeah. It was a lot of fun.